FILED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### JASPER DIVISION

01 OCT 10 AM 8: 11

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| JEFFREY K. BLELL and | ) | |
| FRED K. BLELL, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CV 00-JEO-2302-J |
| | ) | |
| WAL-MART STORES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

ENTERED

OCT 1 0 2001

## MEMORANDUM OPINION

In this action, which was commenced in Walker County Circuit Court, plaintiffs Jeffrey

K. Blell and Fred K. Blell ("the plaintiffs") assert that defendant Wal-Mart Stores, Inc. ("the

defendant") unlawfully detained them, maliciously prosecuted them, and made false and

defamatory statements concerning them. (Doc. 1).[1]  Presently before the court is the defendant's

motion for summary judgment (doc. 7) and the plaintiffs' motion to strike the supplement to the

defendant's brief in support of its motion for summary judgment (doc. 18).  Upon consideration,

the court finds that the defendant's motion for summary judgment is due to be granted in part and

denied in part and the plaintiffs' motion to strike is due to be denied.

## I.  FACTUAL SUMMARY

The plaintiffs entered the Jasper Wal-Mart in the evening of  July 13, 1998, so that

Jeffrey Blell could return a broken fishing rod he had purchased earlier.  (Doc. 7, Ex. A at 47-50,

63; Ex. B at 32-33).  They initially went to the service desk.  Jeffrey Blell gave the fishing rod to

the clerk and received a refund.  (Ex. A at 53-54, 59).  After he received his refund, Jeffrey Blell

---

[1] References to "Doc. ___" are to the numbers assigned by the Clerk of the Court to a particular pleading. References herein to "Ex. ___" are to the exhibits attached to each document in a pleading. References to "p. ___" are to the page.

went to the sporting goods department. (Ex. A at 64). He was there approximately 45 minutes (*id*. at 74) and Fred Blell was there during a part of that time. (*Id*. at 74-75, Ex. B at 34). Jeffrey Blell was looking for a new rod to replace the broken one. (Ex. A at 77-78). He examined many of the rods that were on display. (*Id*. at 79). Fred Blell looked at some of the rods as well, but was not very interested because he was not a fisherman. (Ex. B at 36). Fred Blell then left the sporting goods department to look elsewhere. (Ex. B at 37).

Jeffrey Blell left the sporting goods department and returned a couple of times. (Ex. A at 90-104). When he left the sporting goods department for the last time, Jeffrey Blell had the fishing rod he intended to purchase with him. (*Id*. at 104). He went to the electronics department and then went back towards the sporting goods department to meet Fred Blell. (*Id*. at 103-04).[2] The two of them then proceeded to the garden department to buy a guard for a Weed Eater. (Ex. A at 104-05; Ex. B at 42). When they learned that Wal-Mart did not have one, they went to checkout. Jeffrey Blell purchased the fishing rod for $41.95. (Ex. A at 107; Ex. B at 46). After they left the checkout area and exited the store, they were approached by a Wal-Mart employee, Phil Merritt. (Ex. A at 114; Ex. B at 43).

Merritt asked Jeffrey Blell how much he had paid for the rod. (Ex. A at 116; Ex. B at 45). He responded that it was 40 or 41 dollars. (Ex. A at 116). Jeffrey then produced the receipt. (*Id*.). The Wal-Mart employee "asked [them] to come with him back into the store." (Ex. A at 117; Ex. B at 47). Jeffrey asked what was going on and Merritt simply asked them again to accompany him back into the store. (Ex. A at 117-18). They followed him into the

---

[2] Fred Blell believes that they got back together in the sporting goods department and then went to the electronics and gardening departments. (Ex. B at 41-42). This difference is not significant under the present circumstances.

store. (Ex. A at 119-20). By this time, Jeffrey "figured that there was some kind of mistake." (Ex. A at 120). He was aggravated at being escorted back into the store, but he did not mind cooperating. (Ex. A at 122). Fred Blell also did not mind cooperating by answering any questions. (Ex. B at 49-50). They went back to an office and were asked to sit down. (Ex. A at 126; Ex. B at 49). Merritt then asked them about signing some forms and about whether he (Jeffrey Blell) had changed the price tag on a rod.[3] (Ex. A at 127). Merritt filled out some paper work while the Blells waited. This may have taken five to ten minutes. (Ex. A at 128). Another Wal-Mart employee was present while they were in the office. (Ex. A at 128; Ex. B at 52-53). Fred Blell recalled that they were asked to empty their pockets. (Ex. B at 50). At some point, Merritt left for a few minutes. (Ex. A at 129). Both Jeffrey and Fred Blell denied participating in any price tag switch. (Ex. A at 108-10; Ex. B at 64).

A police officer arrived about the time Merritt told them that he believed that they had switched the price tag on the rod. (*Id.*; Ex. B at 53-54). Jeffrey Blell stated that the claim was "ridiculous." (*Id.* at 132). The plaintiffs were in the office for about thirty minutes. (Ex. B at 135). Fred Blell asserts that he asked several times if they could leave. (Ex. B at 54-56). Merritt may have stated, "no, or not yet." (*Id.* at 56-57). They were arrested and handcuffed by the police. (Ex. A at 137). They were taken to the police station, fingerprinted, and photographed. (Ex. A at 142-43; Ex. B at 62). They were there about one hour before their parents came down and posted a bond. (*Id.* at 144).

Merritt signed a complaint in support of the arrest warrant for Jeffrey Blell. (Doc. 7, Ex. C, p. 2 ). He stated that he "observed Jeffrey Blell select a fishing rod and take the price tag off.

---

[3] Fred Blell asserts that the question concerning the price tag was directed at both of them. (Ex. B at 49-50).

3

It was then replaced [ ] with the price tag from another fishing rod. He then went to the garden center and paid for the rod with the cheaper price tag." (*Id.*). The complaint alleges that the rod was valued at $104.97. (*Id.*). Jeffrey Blell was charged with third degree theft of property. (*Id.*). Merritt signed a "deposition" in the criminal case wherein he states: "I Phil Merritt observed Jeff Blell and Fred Blell select an [sic] fishing rod and take the price tag off. They then replaced it with the price tag from another fishing rod. They then went to the Garden Center and paid for it with the cheaper price tag. They exited the garden center doors and was [sic] stopped on sidewalk." (*Id.* at 7).

When Merritt was completing his "Wal-Mart Loss Prevention Apprehension Report," another employee, Paula Aaron, talked with him about the incident. (Doc. 12, Ex. G). Merritt told her that he had not seen the men take anything, "but that another employee, Angie, told him that she had seen them switching price tags." (*Id.*). Aaron told him that he had made a "bad stop." (*Id.*). She reported that to Danny Sorrells, the Loss Prevention Supervisor, who told her to document the matter. (*Id.*). She did that by leaving a report for him. Aaron stated that it was Wal-Mart's policy that the loss prevention specialist had to personally witness a shoplifting incident and that the specialist was not to take the word of another employee. (*Id.*). The "Wal-Mart Loss Prevention Apprehension Report" states:

> I Phil Merritt observed Mr. Blell and Mr. Fred Blell select a [sic] All Star fishing rod and take the price tag off. They then replaced it with a Mitchell price tag. They then went to the garden center and paid for it with the cheaper price tag. They then exit [sic] the garden shop doors. I stopped them on the sidewalk and brought them to the halding [sic] room. Police were called. Trespass was given.

(Doc. 7, Ex. C, p. 10). Merritt was terminated on August 17, 1998, after he violated Wal-Mart's policy about dating store employees. (Doc. 7, Ex. D, p. 1).

4

The criminal case against Jeffrey Blell was set for a trial in state court. The case was continued when Merritt did not show for court. (Ex. A at 148). The case was reset. Merritt again did not show for trial and the case was reset again. (*Id.*) It was dismissed by the trial judge on October 8, 1998, at the third setting when Merritt once again failed to appear for trial. (*Id.* at 149-50; Ex. C).

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Celotex,* 477 U.S. at 322-23; *see* FED. R. CIV. P. 56(a) and (b). Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts

showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. *Id.*

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322.

The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. A judge's guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 259; *see Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11, 103 S. Ct. 2161, 76 L. Ed. 2d 277 (1983). *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 643 (11th Cir. 1997). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matusushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

If the evidence is merely colorable, or is not significantly probative, summary judgment

6

may be granted. *Anderson*, 477 U.S. at 249 (citations omitted); *accord Spence v. Zimmerman*,
873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through
the prism of the substantive evidentiary burden," so there must be sufficient evidence on which
the jury could reasonably find for the plaintiff. *Anderson,* 477 U.S. at 254; *Cottle v. Storer
Communication, Inc.,* 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility
determinations, the weighing of evidence, and the drawing of inferences from the facts are the
function of the jury, and therefore the evidence of the nonmovant is to be believed and all
justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The nonmovant
need not be given the benefit of every inference but only of every reasonable inference. *Brown v.
City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988). "If reasonable minds could differ
on the inferences arising from undisputed facts, then a court should deny summary judgment."
*Allen*, 121 F.3d at 643. *See also Shelon v. Boston Fin., Inc.*, 638 So. 2d 824, 825 (Ala. 1994)
("In reviewing a summary judgment, we must construe the evidence in the manner most
favorable to the appellant, and we must resolve all doubts against the appellee.").

## III. DISCUSSION

### A. False Imprisonment

#### 1. Preclusion of the claim

The defendant initially asserts that summary judgment is due to be granted on the false
imprisonment claim because it is a result of the plaintiffs' arrest and prosecution and therefore
can only be advanced as a claim for malicious prosecution. (Doc. 8, p. 7). In support of this
position, the defendant cites to *K-Mart, Inc. v. Asaro*, 751 So. 2d 513 (Ala. Civ. App. 1999).
The plaintiffs disagree, citing *Grant v. Dolgen Corp*, 738 So. 2d 892 (Ala. Civ. App. 1998) and

7

*Whitley v. Food Giant, Inc.*, 693 So. 2d 502 (Ala. Civ. App. 1997).  (Doc. 13, pp. 7-9).

In *Asaro*, the plaintiff was arrested at her home on a charge of negotiating a worthless

check.  She sued K-Mart and a store employee, claiming false imprisonment, fraud, and abuse of

process after K-Mart pursued the criminal charges against her.  The trial court overruled the

defendants' motion for a judgment as a matter of law and submitted the case to the jury.  The jury

returned a general verdict, awarding the plaintiff $8,042 in compensatory damages and $10,000

in punitive damages.  The defendants appealed, arguing, among other things, that the trial court

erred in allowing the false imprisonment claim to go to the jury.  Reversing the trial court, the

Alabama Court of Civil Appeals stated:

> Both the false-imprisonment and the abuse-of-process claims arose from
> the same set of circumstances--Asaro's arrest and prosecution for negotiating a
> worthless instrument.  In *Cutts v. American United Life Ins. Co.*, 505 So. 2d 1211,
> 1214 (Ala. 1987), our supreme court stated:
>
>> "[The plaintiff's] complaint, if it states a claim at all, can
>> only be an action for malicious prosecution.  Malicious prosecution
>> is an action disfavored in the law.  [. . . .]  The wrongdoing which
>> [the plaintiff] alleges centered around the procurement of the
>> indictment against him.  *Indeed, the damages he claims are for the
>> expense, emotional suffering, and humiliation incurred in being
>> indicted and having to defend himself.*  The policy disfavoring
>> malicious prosecution claims would also disfavor bringing claims
>> arising out of facts within the ambit of malicious prosecution but
>> couched in other terms, especially general allegations of
>> negligence, willfulness, or wantonness.  Therefore, in the absence
>> of any other clearly recognized theory under which [the plaintiff]
>> could proceed, his complaint must be treated as one for malicious
>> prosecution.

*Asaro*, 751 So. 2d at 515 (emphasis in original).  In *Cutts*, the plaintiff brought claims against

various companies after he was indicted on fraud charges involving allegations that he withheld

premiums from employees' paychecks without remitting them to the health insurer.  The charges

8

were dismissed. He asserted claims for "negligent or intentional, willful, and wanton

misrepresentation or suppression of material facts" and defamation. *Id.*, 505 So. 2d at 1215. The

trial court granted the defendants' motions for summary judgment and the plaintiff appealed.

Affirming the conviction, the court made the statement cited above in *Asaro*.

In *Grant*, the plaintiff brought an action against a store and a customer after he was

arrested for shoplifting. The plaintiff alleged, among other claims, that he was falsely

imprisoned when he was arrested after the defendant's store manager called the police to report

that the plaintiff had taken a shirt from the store without paying for it.[4] Finding that factual

disputes precluded summary judgment on the false imprisonment claims, the court stated:

A wrongful or false arrest will support a claim for false imprisonment.
*Upshaw v. McArdle*, 650 So. 2d 875, 878 (Ala. 1994). In *Crescent Amusement
Co., Inc. v. Scott*, 34 Ala. App. 335, 338, 40 So. 2d 882, 885 (1949), the Court of
Appeals stated the following:

Where one merely reports to an officer what he has seen,
and an arrest and imprisonment of a third person follows from an
investigation subsequently made by the officer, the arrest and
imprisonment is the act of the officer, and not of the informant.
And if the officer acts solely on his own initiative, the informant is
not liable even though he directs or requests such arrest, and even
though he be actuated by malice or other improper motive.

"On the other hand *one may be held responsible as the
instigator of an arrest without expressly requesting or demanding
it if the facts surrounding the arrest reasonably create a
permissible inference of such instigation.*"

. . . .

In *Crown Central Petroleum Corp. v. Williams*, 679 So. 2d 651, 655 (Ala.
1996), our supreme court, in a malicious prosecution case, made it clear that "a

---

[4] The investigating officers determined that the plaintiff could not have stolen the shirt from the defendant store
because it was sold exclusively by another store. *Grant*, 738 So. 2d at 893.

person does not instigate an arrest by merely providing information that results in another's arrest, unless the person acts in bad faith (i.e., lacks any reasonable basis upon which to accuse another of a crime)."

In the instant case, [the defendant] had the initial burden of showing that [the plaintiff] had no basis for a false imprisonment claim. . . .

*Grant*, 738 So. 2d at 894 (emphasis in original).

In *Whitley*, the plaintiff brought an action against a store and others after his arrest and prosecution for resisting arrest and for disorderly conduct following his arrest by an off-duty police officer who was working at the store. One claim alleged that he was falsely imprisoned. The trial court dismissed the claim. On appeal, the court held that the trial court erred in dismissing the claim because under Alabama law, "an employer can be liable for false imprisonment where its agent causes a wrongful arrest while acting within the scope of his or her employment." *Whitley*, 693 So. 2d at 505.

Each of the foregoing cases are distinguishable from the situation presented in this case. For instance, in *Asaro*, the information regarding the matter was presented to the authorities, an arrest warrant was obtained, and the plaintiff was arrested at her home after the judicial process was invoked. *Cutts* is also distinguishable because there was no false imprisonment claim alleged. *Whitley* is distinguishable because the issue of whether a false imprisonment claim is precluded when the underlying facts are also part of a malicious prosecution claim was not presented to the court.

This court cannot conclude as a matter of law on the facts presently before it that the plaintiffs' false imprisonment claims are precluded. This is particularly true because the plaintiffs could arguably state a false imprisonment claim based on the actions Merritt took

10

before the formal arrests occurred.

### 2. No evidence of restraint

The defendant next asserts that the false imprisonment claims are insufficient as a matter of law because the plaintiffs have not presented any evidence that they were restrained. (Doc. 8, p. 8). The plaintiffs counter that the evidence shows that they were restrained after they were arrested and at some point while they were in the Wal-Mart office. (Doc. 13, p. 7).

The Alabama Court of Civil Appeals in *Grant*, 738 So. 2d at 894, stated:

> "'False imprisonment consists of the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty. Ala. Code 1975, § 6-5-170. For there to be a false imprisonment, there must be some direct restraint of the person; however, it is not necessary that there be confinement in a jail or a prison. Any exercise of force, or the express or implied threat of force, by which in fact the other person is deprived of his liberty, compelled to remain where he does not wish to remain, or to go where he does not wish to go, is an imprisonment.'" (quoting *Big B, Inc. v. Cottingham*, 634 So. 2d 999, 1001 (Ala. 1993)).

*Accord Sanders v. Shoe Show, Inc.*, 778 So. 2d 820, 822-23 (Ala. Civ. App. 2000). In *Cottingham*, the court found that the evidence was sufficient to submit a false imprisonment claim to the jury where the plaintiff established that (1) the store manager falsely accused the plaintiff of participating in a theft and demanded that she tell him who the shoplifter was; (2) the manager was formerly a U. S. Marine; (3) he stood between the plaintiff and the door; (4) he intimidated her and threatened to have her arrested and prosecuted on shoplifting charges if she did not cooperate; (5) he verbally abused her in a manner, which by the manager's testimony, "no human being should have ever went through;" and, (6) she was too afraid to leave the room. *Cottingham*, 634 So. 2d at 1002.

In *Williams v. Wal-Mart Stores, Inc.*, 2000 WL 13679977 (S.D. Ala. Sept. 5, 2000), the

plaintiff, a former Wal-Mart employee, claimed she was subjected to false imprisonment by the defendant when she was accused by two assistant managers and a loss prevention officer of under-paying for merchandise she had purchased. The defendant moved for summary judgment. The court granted the same, finding that there was no use of force, actual or threatened, to support her claim. The evidence was that (1) the plaintiff was called to go to the manager's office where three Wal-Mart employees met with her; (2) the loss prevention officer informed her she could be imprisoned for stealing; (3) when another Wal-Mart employee attempted to enter the room, the employee was obstructed from entering by one of the assistant managers; (4) the plaintiff was upset and wished to leave; (5) the plaintiff stated that she "reasonably believed that she was confined;" and, (6) the plaintiff's asthma condition was aggravated by the meeting. *Williams*, 2000 WL 13679977, at *3. The opposing evidence was that she admitted that she did not ask to leave, nor did she make any attempt to leave. *Id*. The Alabama Supreme Court concluded under the facts that it could not find that these actions "constituted the implied threat of use of force." *Id*. at *4.

In the present case there is no evidence of force prior to the plaintiffs' entering the room. The only evidence even approaching restraint is the testimony of Fred Blell that he asked a number of times if they could leave. Because this issue is pivotal, his testimony is repeated:

Q. Okay. Anything else you can think of?

A. I know I probably asked several times during this course of the meeting - - "Can we leave now," may have been asked, but - -

Q. Now, Jeff, didn't say anything about that. Is that something different that you recall?

A. I think maybe a few times during - - in that office I had asked, "Can we leave now," you know, because that's when I had felt - - that's when I noticed that we had been

12

detained against our will, you know, I mean.

Q. Really?

A. Uh-huh.

Q. Well, now, was this before or after he called the police?

A. Probably before.

Q. All right. Now, how long were you in the office in your best judgment?

A. It seemed forever, but it may have been 30 minutes or more.

Q. And when did you first ask "Can we leave now?"

A. After, you know, accusing us and all this, and I think when we emptied our pockets and all, about then.

Q. Which was when? How many minutes into the - -

A. Probably about 10 minutes, maybe.

Q. All right. And you asked that of Phil Merritt?

A. Uh-huh.

Q. And what did he say?

A. I believe he said no, or not yet. I mean, he hadn't really told us at that time that we were going to be arrested, and he refused to offer any other information. I know I may have even asked - - I don't know if I asked any questions, but - -

Q. Now, don't tell me what you may have asked, tell me what you remember asking.

A. I asked if we could leave. I don't believe if he directly answered that.

Q. Well, now, just a minute ago you said not yet. You think he may have said that, or he did say that?

A. I think he may have said not yet, which leads me to believe I - - I wasn't sure what was going to be the outcome of this until after I noticed when he called the police or had the police called.

13

(Doc. 12, Ex. B, pp. 54-57).

The plaintiffs were in the office about thirty minutes; there is no evidence of threatening or other coercive methods being employed by Merritt; there is no evidence of verbal abuse; there is no evidence of any display by Merritt (or anyone else) of legal authority over the plaintiffs; and, other than the foregoing testimony, there is no evidence that the plaintiffs ever asked to leave.[5] Fred Blell's equivocal statements during the deposition about what Merritt "may have said" are not sufficient to overcome the defendant's motion for summary judgment concerning the events occurring in the Wal-Mart office. There simply is not the requisite showing of "restraint" through the "'exercise of force, or the express or implied threat of force, by which in fact the other person is deprived of his liberty, compelled to remain where he does not wish to remain, or to go where he does not wish to go, is an imprisonment.'" *Cottingham*, 634 So. 2d at 1001.

### 3. Precipitating the arrest of the plaintiffs

The plaintiffs also assert that because Merritt, as the agent of Wal-Mart, initiated the police involvement and their arrest, the defendant is liable for false imprisonment. (Doc. 12, p. 7).

As already noted, the *Grant* court held that one is not responsible for merely reporting a criminal violation to the police absent bad faith. *Grant,* 738 So. 2d at 894.[6] *See also Williams v.*

---

[5] Jeffrey Blell did not state anywhere in his deposition that either of the plaintiffs asked about leaving.

[6] In *Crown Central Petroleum Corp.*, which is cited in *Grant*, the court stated:

... it is well settled that liability for false imprisonment, like liability for malicious prosecution, cannot be predicated merely on a person's good faith act of giving information to a police officer tending to show that a crime has been committed or on a person's good faith act of identifying one suspected of a crime, for such involvement in another's detention or arrest is not regarded in the law as an instigation of or

14

*Wal-Mart*, 2000 WL 1367977, at *3-4. Thus, under *Grant* and *Crown*, a plaintiff may be able to

bring a false imprisonment claim premised on the defendant's agent's misconduct in accusing a

plaintiff of criminal conduct which results in that person's arrest.[7]

The plaintiffs cite *Grant* in support of their position that summary judgment is precluded

due to a factual dispute created by the discrepancy between Merritt's statements in the complaint

and "deposition" and Aaron's affidavit which states that he told her that another employee

observed the switching of the tags. (Doc. 12, p. 8). The plaintiffs also note that Merritt was not

meeting his "apprehension quota" as a loss prevention specialist. (*Id*. at 9). The defendant

counters that there was probable cause to support the arrest, that is, the observations of the sales

associate. (Doc. 17, p. 2).

In *Grant*, the facts were disputed:

> . . . . The evidence, however, when viewed in a light most favorable to Grant,
> suggests the following: On December 4, 1995, Grant entered Dollar General to
> purchase certain items. After purchasing the items, he exited the store and
> proceeded to a nearby restaurant for lunch. According to Dollar General's
> manager, a customer in the store informed her that he had seen Grant take a shirt
> from a rack and leave the store without paying for it. The manager testified that
> she examined the area around the rack and did not find any evidence, i.e., empty
> hangers or tags, in the area. The manager, nevertheless, contacted the Atmore
> Police Department and reported the incident. Officer Kenneth Hall stated that he
> monitored the call and went to Dollar General to speak to the manager about the
> incident. According to Officer Hall, the manager reported that both she and the
> customer witnessed Grant take the shirt from the rack, put the shirt on, and leave
> the store. While Grant was in the restaurant, Officer Hall and Officer Chris Pruitt

---

participation in the detention or arrest.

*Crown*, 679 So. 2d at 654.

[7] The plaintiff in *Crown* was the mother of a juvenile arrested after he allegedly robbed a convenience store. The trial court entered a judgment in favor of the plaintiff after a jury verdict for her as the guardian. The defendant appealed. The plaintiff contended that the defendant's clerk falsely accused her son, which resulted in his arrest, to cover her theft of the defendant's money. The Alabama Supreme Court found that the jury verdict must be reversed because there was no evidence to support it. *Crown*, 679 So. 2d at 657.

15

> approached Grant and inquired about the shirt that he was wearing. Grant raised
> his voice at the officers, who requested that Grant step outside. While outside, the
> officers apparently accused Grant of stealing the shirt. Grant told the officers that
> he had purchased the shirt from K-Mart, and he requested that the officers
> examine the tag in the collar of the shirt to verify this fact. During the
> conversation, Grant became hostile, and the officers arrested him for disorderly
> conduct. Thereafter, the officers transported Grant in the police car to Dollar
> General to address the matter. When the officers arrived at Dollar General, the
> manager exited the store, approached the police car, and apparently stated, "that's
> the man and that's the shirt." After conducting an investigation, the officers
> discerned that Grant could not have stolen the shirt from Dollar General, because
> the shirt was sold exclusively by K-Mart. No charges were filed against Grant,
> and the police officers subsequently released him from their custody.

*Grant*, 738 So. 2d at 895. The defendant asserted that "(1) its manager did not witness the theft;

(2) its manager merely conveyed to the police what a customer claimed to have witnessed; (3) the

police officers, acting on their own initiative, arrested Grant for disorderly conduct, not for

shoplifting; and (4) Grant was never charged and/or arrested for shoplifting." *Id.* at 894. "Grant,

on the other hand, contend[ed] that the manager instigated his arrest by maliciously and in bad

faith conveying to Officer Hall that she had personally witnessed the theft when, in fact, she had

not. In other words, Grant contend[ed] that the manager lacked probable cause to believe that

Grant had stolen the shirt." *Id.* at 895. Reversing the trial court's grant of summary judgment,

the court stated "that a genuine issue of a material fact exists as to whether the manager did, in

fact, instigate Grant's arrest by maliciously and in bad faith making false charges to the police

officers, who subsequently pursued Grant." *Id.* at 896.

 In this case, Wal-Mart has the initial burden of showing that the plaintiffs have no basis

in fact for their false imprisonment claim. *See Grant*, 738 So. 2d at 894. The evidence presented

by the defendant is that Merritt personally observed the plaintiffs' actions. The plaintiffs

generally deny switching any tags. They also have presented Aaron's affidavit disputing that

16

Merritt personally observed the plaintiffs. They also presented evidence that Merritt was fired, that he violated company policy, and that he failed to show up for Jeffrey Blell's trial and the charge was ultimately dismissed. The court also notes that there is no evidence before it that a complaint was ever filed against Fred Blell. This evidence creates a factual dispute concerning whether Merritt ever observed the purported conduct by the plaintiffs, creating an issue as to whether he acted in good faith in reporting the events to the police and having the plaintiffs arrested.

Probable cause is "[a] reasonable ground for suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense charged." *Eidson v. Olin Corp.*, 527 So. 2d 1283, 1285 (Ala. 1988) (citation and internal quotation marks omitted). The court recognizes that probable cause to believe an offense has been committed may be based on hearsay evidence, such as the observations of a sales associate that are relayed to a loss prevention specialist. *See, e.g., Pearson v. Delchamps, Inc.*, 578 So. 2d 1086 (Ala. 1991) (allowing evidence that employee relayed information of theft to an assistant manager who signed a complaint). The defendant asserts that Aaron's affidavit, in fact, supports the existence of probable cause. Accordingly, it claims that the false imprisonment claim is precluded. They cite to *Thomas v. Hamilton*, 611 So. 2d 1038 (Ala. 1992). In *Thomas*, the plaintiff who was a guest at the defendant's hotel brought suit against the hotel and its manager for false imprisonment and malicious prosecution after he was arrested for failing to pay the portion of his bill attributable to the use of the telephone. The trial court granted summary judgment, finding that there was a prima facie showing of probable cause to support the plaintiff's arrest and that he had not presented any evidence rebutting the

17

same.  The court stated:

> It is clear from the record that although there may have been a misunderstanding between [the plaintiff's employer] and the plaintiff regarding who would actually write the check for the telephone charges accumulated by [him], it is equally clear from the record that [the hotel] had a right to expect its money.  [The defendant manager] had been informed by [the plaintiff's employer] that [he] would be responsible for the charges and had been told not to allow him to leave without paying for them.  Even if [the employer] had misinformed [the manager] with regard to the arrangements between [the employer] and [the plaintiff], [the manager] had every right to rely on [the employer]'s statement to her that [the plaintiff] would be paying his own bill.  She, therefore, would be justified in telephoning the police when he attempted to leave the premises without paying for the charges.

*Thomas*, 611 So. 2d at 1040.

*Thomas* is factually distinguishable.  There was no question that probable cause existed in that case.  Although Thomas may have had a legitimate dispute with his employer over who was responsible for the telephone bill, that dispute did not negate his responsibility for the same to the hotel.  In this case, there is a factual dispute as to whether there was probable cause.  Merritt states in his "deposition" and Wal-Mart Loss Prevention Apprehension Report that he observed the plaintiffs change the price tags.  The plaintiffs testified at their depositions that they did not change the price tags; the case against Jeffrey Blell was dismissed when Merritt failed to show for trial;[8] Merritt told Aaron that it was another employee that saw the plaintiffs; Merritt violated Wal-Mart policy if he failed to actually witness the events; and, he was not meeting his apprehension quotas.  Additionally, there is no evidence that Fred Blell participated in the purported theft.  Under the circumstances, the court cannot resolve the bad faith issue as a matter of law.  Summary judgment on the false imprisonment claim must be denied to the extent it is

---

[8] As best the court can discern from the record, no action was taken against Fred Blell after he was arrested as an accomplice.  (*See* Doc. 7, Ex. C, p. 15).

18

premised on the plaintiffs' arrest by the law enforcement officer.

## B. Malicious Prosecution

In order to submit the plaintiffs' malicious prosecution claim to the jury, the court must

find that there is sufficient evidence "(1) that the present defendant instituted a prior judicial

proceeding against the present plaintiff; (2) that in instituting the prior proceeding the present

defendant acted without probable cause and with malice; (3) that the prior proceeding ended in

favor of the present plaintiff; and (4) that the present plaintiff was damaged as a result of the

prior proceeding." *Wal-Mart Stores, Inc. v. Goodman*, 789 So. 2d 166, 2000 WL 1868437, at \*4

(Ala. Dec. 22, 2000) (citing *Delchamps, Inc. v. Bryant*, 738 So. 2d 824, 831-32 (Ala. 1999)).

The defendant asserts that the plaintiffs have not and cannot establish a lack of probable

cause or that the defendant acted with malice. (Doc. 8, p. 13). The Alabama Supreme Court's

decision in *Goodman* is instructive on both issues:

> In malicious prosecution cases, "probable cause" is defined as "such a state of
> facts in the mind of the prosecutor as would lead a man of ordinary caution and
> prudence to believe or entertain an honest and strong suspicion that the person
> arrested is guilty." *Delchamps, Inc. v. Morgan*, 601 So. 2d 442, 445 (Ala. 1992)
> (citation omitted). Thus, the determination of probable cause does not hinge upon
> whether Goodman was in fact guilty of shoplifting, but whether Milner's
> subjective belief under the circumstances led her to believe that Goodman was
> guilty. In order to produce substantial evidence on the element of lack of probable
> cause, Goodman had to present evidence "of such weight and quality that
> fair-minded persons in the exercise of impartial judgment [could] reasonably infer
> the existence of the fact sought to be proved." *West v. Founders Life Assurance
> Co.*, 547 So. 2d 870, 871 (Ala. 1989).
>
> Malice is an inference of fact, and it may be inferred from a lack of
> probable cause or from mere wantonness or carelessness if the actor, when doing
> the act, knows it to be wrong or unlawful. *Bryant*, 738 So. 2d at 833. Personal ill
> will or a desire for revenge is not essential for a finding of malice. *Delchamps,
> Inc. v. Larry*, 613 So. 2d 1235, 1239 (Ala. 1992). However, an inference of
> malice drawn from the lack of probable cause may be rebutted by evidence

19

showing that the defendant acted in good faith. *Bryant*, 738 So. 2d at 832.

*Goodman*, 2000 WL 1868437, at *4-5.

Relying on the discussion in the last section, the court finds that the plaintiffs have

presented sufficient evidence to overcome the defendant's motion for summary judgment

premised on a claim that they (the plaintiffs) have not shown a lack of probable cause. The court

recognizes that this is a significant burden; however, under the unusual facts presented, the court

finds that the burden has been met. The claim should be submitted to the jury. Similarly, the

disputed evidence concerning the issue of malice warrants submission of this matter to the jury.

The motion, therefore, is due to be denied.

### C. Slander

Lastly, the defendant asserts that the plaintiffs' slander claims are due to be dismissed.

Specifically, it asserts that there were no defamatory statements and, even if there were, there is

no evidence of publication. (Doc. 8, p. 10). The pertinent law is succinctly stated in *Atkins Ford*

*Sales v. Royster*, 560 So. 2d 197 (Ala. 1990):

> To establish a prima facie case of defamation, the plaintiff must show that
> the defendant published a false and defamatory statement concerning the plaintiff
> to a third person. *Nelson v. Lapeyrouse Grain Corp.*, 534 So. 2d 1085 (Ala.
> 1988). Statements made subject to a qualified privilege are not actionable unless
> the plaintiff can prove that the defendant acted with malice. *Mead Corp. v. Hicks*,
> 448 So. 2d 308, 313 (Ala. 1983). The determination of whether a statement is
> privileged is a question of law for the trial judge. *Webster v. Byrd*, 494 So. 2d 31
> (Ala. 1986). The test for determining whether a conditional or qualified privilege
> exists is as follows:
>
> > "'Where a party makes a communication, and such
> > communication is prompted by duty owed either to the public or to
> > a third party, or the communication is one in which the party has an
> > interest, and it is made to another having a corresponding interest,
> > the communication is privileged, if made in good faith and without

20

> actual malice. * * *  The duty under which the party is privileged
> to make the communication need not be one having the force of
> legal obligation, but it is sufficient if it is social or moral in its
> nature and defendant in good faith believes he is acting in
> pursuance thereof, although in fact he is mistaken.'"

*Willis v. Demopolis Nursing Home, Inc.*, 336 So. 2d 1117 (Ala. 1976)(quoting
*Berry v. City of New York Ins. Co.*, 210 Ala. 369, 98 So. 290 (1923)).

*Royster*, 560 So. 2d at 200.  Additionally, communications between employees within the line

and scope of their duties are not publication to a third party.  *Schrimsher v. Liberty Nat. Life Ins.*

*Co.*, 655 So. 2d 986, 988 (Ala. 1995); *Burns v. Pickwick Hotel*, 607 So. 2d 187, 189 (Ala. 1992).

Still further, an employee is entitled to a qualified privilege in reported suspected theft of his

employer's property.  *Mead Corp. v. Hicks*, 448 So. 2d 308, 313 (Ala. 1983).  If a defendant

asserts a qualified privilege, as Wal-Mart does, a "plaintiff must plead defamation with actual

malice and bears the burden of proving defamation with actual malice to prevail."  *Ex parte Blue*

*Cross and Blue Shield of Alabama*, 773 So. 2d 475, 478-79 (Ala. 2000).  "The affirmative

defense of qualified privilege so pleaded and proved will defeat a claim of innocent or mistaken

defamation, because this defense negates the malice implied by the mere falsity of a defamatory

statement."  *Ex parte Blue Cross and Blue Shield of Alabama*, 773 So. 2d at 479 (*citing Lawson*

*v. Hicks*, 38 Ala. 279, 285 (1862); APJI 23.12).  "'[A]ctual malice' means common law malice,

which 'may be shown by evidence of previous ill will, hostility, threats, rivalry, other actions,

former libels or slanders, and the like . . . or by the violence of the defendant's language, the

mode and extent of publication, and the like.'" *Hayes v. Wal-Mart Stores, Inc.*, 953 F. Supp.

1334, 1341 (M.D. Ala. 1996).

The evidence before the court demonstrates that, even if the statements are false, their

21

publication is qualifiedly privileged. The only way the plaintiffs can overcome the defendant's motion for summary judgment is if they meet the "actual malice" standard. This is a greater burden than is required in the previous discussions. The plaintiffs have demonstrated no "actual malice." Thus, the defendant's motion for summary judgment is due to be granted on this claim.

## IV.  CONCLUSION

Premised on the reasons stated above, the defendant's motion for summary judgment (doc. 7) is due to be granted in part and denied in part and the plaintiffs' motion to strike is due to be denied. An appropriate order will be entered.

DONE, this the __9th__ day of October, 2001.

JOHN E. OTT
United States Magistrate Judge

22